UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY HIXSON,

          Plaintiff,                    CIVIL ACTION NO. 11-10509

          v.                       DISTRICT JUDGE PAUL D. BORMAN

COMMISSIONER OF             MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

          Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**I.      PROCEDURAL HISTORY**

      ***A.      Proceedings in this Court***

On February 8, 2011, Plaintiff filed this suit seeking judicial review of the Commissioner's decision disallowing benefits (Dkt. No. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of Supplemental Security Income benefits (Dkt. No. 3). This matter is currently before the Court on Plaintiff's motion to remand and Defendant's motion for summary judgment (Dkt. Nos. 13, 14).

      ***B.      Administrative Proceedings***

Plaintiff filed the instant claims on January 29, 2009, alleging that she became unable to work on August 15, 2003 (Tr. 15, 113-115). The claim was initially disapproved by the Commissioner on June 12, 2009 (Tr. 59-62). Plaintiff requested a hearing and on June 3, 2010, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) John L. Christensen, who

considered the case *de novo*.  In a decision dated June 23, 2010, the ALJ found that Plaintiff was disabled, but would not be disabled if she stopped abusing alcohol (Tr. 12-26).  Plaintiff requested a review of this decision on July 15, 2010 (Tr. 10-11).  The ALJ's decision became the final decision of the Commissioner when, after the review of additional exhibits[1] (AC-10E, 22F-26F, Tr. 163-166, 545-723), the Appeals Council, on December 21, 2010, denied Plaintiff's request for review (Tr. 1-6).

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled if she stopped abusing alcohol.  Accordingly, it is **RECOMMENDED** that Plaintiff's motion to remand be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    STATEMENT OF FACTS

### A.    ALJ Findings

Plaintiff was 32 years old on the date her application was filed (Tr. 21).  Plaintiff has past relevant work as a nurse's aide (Tr. 21).  The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since January 29, 2009 (Tr. 17).  At step two, the ALJ found that Plaintiff had the following "severe" impairments: carpal tunnel syndrome, ETOH (*i.e.*, alcohol) abuse, asthma, bipolar disorder and post traumatic stress disorder (PTSD) (Tr. 17-19).  At step three, the ALJ found no evidence

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review.  *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ.  In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 19-20).

Between steps three and four, the ALJ found that, based on all of the impairments, including the substance use disorder, Plaintiff had the Residual Functional Capacity (RFC) to perform "light work...but would require a job that would incorporate no constant repetitive use of either upper extremity for grasping, fingering and no climbing ropes, ladders or scaffolds; no work at unprotected heights or unguarded hazardous machinery.  The individual could perform simple routine tasks by that I mean with minimal changes in the workplace setting and no more than occasional contact with the general public.  As a result of bipolar disorder and PTSD, that individual could not sustain sufficient concentration, persistence or pace, to do even simple routine tasks on a regular and consistent basis 8 hours a day, 5 days a week, 40 hours a [week]" (Tr. 20).  Thus, the ALJ found that Plaintiff was disabled.

The ALJ next considered whether Plaintiff would still be disabled if she stopped abusing alcohol (Tr. 23).  In this regard, the ALJ found that "[i]f [Plaintiff] stopped the substance use, [Plaintiff] would have the [RFC] to perform light work...but would require a job that would incorporate no constant repetitive use of either upper extremity for grasping and fingering and no climbing ropes, ladders or scaffolds; no work at unprotected heights or unguarded hazardous machinery.  The individual could perform simple routine tasks by that I mean with minimal changes in the workplace setting and no more than occasional contact with the general public" (Tr. 23).  At step four, the ALJ found that Plaintiff could not perform her previous work as a nurse's aide.  (Tr. 21)  At step five, the ALJ denied Plaintiff benefits, because the ALJ found that – if Plaintiff stopped abusing alcohol – Plaintiff could perform a significant number of jobs available in the national economy, such as packer (10,000 jobs), inspector (4,500 jobs) or food prep (4,000 jobs) (Tr. 25).

**B.**   *Administrative Record*

    **1.**   **Hearing Testimony and Statements**

Plaintiff testified that she quit drinking in January of 2010 (Tr. 40).  She last worked in 2003 as an assembler, but claims she was fired due to decreased productivity as a result of carpal tunnel syndrome (Tr. 42).  Plaintiff described pain in her hands, which would become swollen and tingle; she testified that a treatment provider had recommended additional surgery on her hands and wrists (Tr. 44-45).  Plaintiff stated that she was unable to physically perform any of her previous work due to chronic neck and back pain (Tr. 43).

Plaintiff was diagnosed with bipolar disorder and claimed that the disorder interfered with her ability to focus (Tr. 44).  She also described problems with concentration but stated that her ability to stay on task if given a job to do was "not too bad" (Tr. 45).

Michelle Schmitzer, Plaintiff's social worker and counselor, testified that she had followed Plaintiff since she started living at Amays House in January 2010 (Tr. 48).  Ms. Schmitzer testified that Amays House tests residents for alcohol and drug usage if they deem it necessary, but that Plaintiff had not been tested, to her knowledge (Tr. 48-49).  According to Ms. Schmitzer, Plaintiff had trouble with mood and emotion regulation and struggled with interacting with others on a constant basis (Tr. 49); Plaintiff also struggled with any type of correction and either became too focused on a single task or could not complete it (Tr. 50).  Ms. Schmitzer testified that Plaintiff had difficulty working with others on a daily basis and likened Plaintiff's behaviors to those of a young adolescent (Tr. 50-51).

    **2.**   **Medical Evidence**

As noted earlier, Plaintiff filed for SSI benefits on January 29, 2009.  "The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after the application date."

*Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Therefore, the summary of medical evidence contained herein will focus on the medical evidence on and after the date Plaintiff applied for SSI – January 29, 2009. Plaintiff's motion for remand made no attempt at summarizing the medical evidence. Defendant accurately summarized the medical evidence as follows:

On January 15, 2009, two weeks before Plaintiff filed for SSI, she presented to the hospital with complaints of symptoms resulting from a burn on her thumb (Tr. 191). A doctor noted that Plaintiff appeared very agitated and tremulous with very high blood pressure (Tr. 191). The doctor opined that Plaintiff was going through alcohol withdrawal (Tr. 191). Plaintiff had cellulitis spreading around a finger down the hand (Tr. 191). The doctor prescribed an antibiotic for cellulitis and Ativan, thiamine, and folate for alcohol withdrawal (Tr. 192).

Two weeks later, Plaintiff presented to a treatment provider at Health Delivery, Inc. (Health Delivery), for follow-up to her hospital treatment (Tr. 291). Although the note is not entirely legible, it appears that the treatment provider noted improvement in Plaintiff's cellulitis, diagnosed degenerative disc disease (DDD), and prescribed Advair for chronic obstructive pulmonary disease (COPD) (Tr. 291).

Plaintiff returned to Health Delivery in February 2009 (Tr. 290). A treatment provider diagnosed conditions including chronic sacral pain, asthma, and alcoholism and prescribed medications (Tr. 290).

In May 2009, Nathalie Menendes, Psy. D., examined Plaintiff for the state DDS (Tr. 302-06). Plaintiff stated that she had been abusing alcohol "for a long time," and had been in substance abuse treatment several times, with a few sober periods (Tr. 302). Plaintiff reported drinking every day and stated that she had withdrawal symptoms if she did not drink (Tr. 302). Plaintiff stated that

she had been diagnosed with depression a few years previously and felt down all the time, was

irritable, did not tolerate stress, and became upset and angry easily (Tr. 302). She reported several

suicide attempts and current suicidal ideation (Tr. 302). Plaintiff also reported poor sleep, fair

appetite, low motivation and energy, and poor self-esteem (Tr. 303). Plaintiff had two children who

lived with others due to her substance abuse (Tr. 303). On examination, Plaintiff smelled of

alcohol, displayed good contact with reality and some limited insight, and had spontaneous and

logical thoughts, which were not always well-organized (Tr. 304). Dr. Menendes opined that

Plaintiff could understand, retain, and follow one and two step instructions and was able to perform

and remember simple, routine, and repetitive tasks (Tr. 305). Dr. Menendes stated that Plaintiff

could perform multi-step tasks, make independent work-related decisions, and engage in abstract

thinking and work that is not routine (Tr. 305). Dr. Menendes noted, however, that Plaintiff's

symptoms of depression and alcohol dependence were significant and would interfere with her

ability to perform any job duty on a consistent and reliable basis (Tr. 306). She stated that Plaintiff

had adequate social skills, but could not cope with stress or difficult situations in the work setting

(Tr. 306). Dr. Menendes diagnosed alcohol dependence, moderate recurrent major depressive

disorder, and personality disorder (Tr. 306).

Later that month, Joelle Larsen, Ph.D., reviewed Plaintiff's records for the state DDS (Tr.

307-24). Dr. Larsen diagnosed major depressive disorder (MDD), personality disorder, not

otherwise specified, and substance addiction disorder (Tr. 312-14). Dr. Larsen opined that Plaintiff

had moderate deficiencies in: activities of daily living; maintaining social functioning; and

concentration, persistence, or pace (Tr. 315). She further opined that Plaintiff's drinking

significantly impaired her functioning and that the extent that her underlying issues impacted

functioning could not be determined due to what appeared to be continued alcohol use (Tr. 309).

Dr. Larsen opined that Plaintiff appeared to have the cognitive ability and concentration necessary to complete tasks, make work related decisions, remember locations, and recall work-like procedures (Tr. 309). She opined that Plaintiff had normal pace, could attend to a two hour task, and could maintain a schedule (Tr. 309). Dr. Larsen stated that Plaintiff's impairments might interfere with complex task completion, but that she could complete other tasks with sobriety (Tr. 309).

In June 2009, Dr. Donald Cady examined Plaintiff for the state DDS (Tr. 325-30). Plaintiff reported carpal tunnel syndrome and stated that she had pain and numbness in her hands despite surgery (Tr. 325). Plaintiff reported being diagnosed with COPD, taking medication for asthma, and smoking a half pack of cigarettes a day (Tr. 302). Plaintiff also reported breaking her tail bone one-and-a-half years previously, which caused pain (Tr. 302). She stated that she had foot pain, despite several operations (Tr. 326). Plaintiff stated that she had a heart problem and reported a hospitalization in 2007, due apparently to alcoholic hepatitis and withdrawal (Tr. 325-26). Plaintiff stated that her primary problem was "pain all over" (Tr. 326). Plaintiff's upper extremities were normal and she had a normal grip and negative Tinel's and Phalen's signs (used to assess carpal tunnel syndrome or nerve damage) (Tr. 327). Plaintiff could walk on her heels and toes, had a normal gait, could walk heel to toe, and could bend and touch the floor; tendon reflexes were absent (Tr. 327). Dr. Cady diagnosed carpal tunnel syndrome, and COPD and asthma, but indicated that the COPD diagnoses was made during a hospitalization where the primary difficulties related to alcohol and alcoholic hepatitis (Tr. 328). Dr. Cady noted arthritis and foot and tail bone problems, but that it was "difficult to assess the amount of problems she ha[d] with that" (Tr. 328).

On January 29, 2010, Plaintiff presented to the hospital for a medication overdose and suicide attempt (Tr. 348-49). During a consultation with a doctor, Plaintiff reported feeling overwhelmed with multiple stressors and was severely depressed (Tr. 350-51). Plaintiff stated that

she had no permanent residence and drank a pint of liquor per day (Tr. 351). Her affect was

depressed, labile, and tearful, and she displayed poor insight and judgment with unpredictable

impulse control (Tr. 352). The doctor diagnosed major depressive disorder, status-post suicide

attempt, history of bipolar disorder, and borderline personality traits (Tr. 352). The doctor

prescribed Seroquel, Librium and Haldol and ordered that Plaintiff be transferred for inpatient

psychiatric treatment (Tr. 352).

Plaintiff was involuntarily admitted to White Pine and received inpatient treatment from

February 1 to February 9, 2010 (Tr. 365, 431). During an initial psychiatric evaluation with Dr. Ali

Ibrahim, Plaintiff reported that she had taken two handfuls of Tylenol and other pain killers in order

to kill herself and that she was homeless and had social, medical, and surgical problems (Tr. 368).

Plaintiff complained of irritability, insomnia, unstable mood, and pain all over her body (Tr. 368).

She reported being sexually assaulted ten days previously, but that the police had not believed her

(Tr. 368). Plaintiff stated that she was an alcoholic, but had not been drinking heavily, except

recently (Tr. 368). She reported a previous suicide attempt and multiple psychiatric hospitalizations

(Tr. 368). Plaintiff stated that she had been in multiple treatment centers in the past for alcohol (Tr.

369). Plaintiff displayed psychomotor agitation, an anxious and depressed mood, and a labile and

mood congruent affect (Tr. 369). Her speech was loud and high pitched at times and she was

difficult to understand (Tr. 369). Plaintiff still had suicidal thoughts and was irritable and unstable

(Tr. 369). Dr. Ibrahim diagnosed bipolar disorder, posttraumatic stress disorder (PTSD), history of

alcohol abuse and dependence, and borderline personality disorder (Tr. 369). Dr. Ibrahim prescribed

Cymbalta (Tr. 370).

During this admission, Plaintiff was also examined by David Segroves, a physician's

assistant (PA) (Tr. 371-73). Plaintiff expressed anger that documents stated that she had been

drinking at the time of the overdose and stated that she had not been drinking that day, but had been drinking the day before (Tr. 371). Plaintiff later stated to a therapist that she consumed a "fifth of alcohol" the day before she took the overdose (Tr. 399). She reported having COPD, asthma, depression, general body aches and pains, and severe back pain (Tr. 371). Plaintiff's back was non-tender on palpation with a full range of motion and she displayed full ranges of arm and leg motion with full strength and a normal gait (Tr. 372). Mr. Segroves diagnosed hyperkalemia (high potassium), menopausal symptoms, COPD, and bipolar disorder and prescribed Pro-Air (inhaler) and Zantac (Tr. 372).

During her treatment at White Pines, Plaintiff's medications were adjusted and her symptoms slowly improved, including her depression, anxiety, insight, and judgement (Tr. 365). Plaintiff was seen on several occasions by a social worker and Dr. Ibrahim (Tr. 365, 416-17). Plaintiff also attended several group therapy sessions (Tr. 432-33, 438-39, 442). During a discharge evaluation, Dr. Ibrahim noted that Plaintiff had a normal psychomotor tone, a euthymic mood, a good range of affect, and normal speech (Tr. 366). Plaintiff was discharged with Cymbalta, Seroquel and Neurontin (Tr. 366).

On February 10, 2010, the day after being discharged from White Pine, Plaintiff presented to "DOT" on referral from White Pine for alcohol use (Tr. 488). Plaintiff apparently had received treatment at DOT on three prior occasions (Tr. 488). A mental status assessment revealed no abnormalities (Tr. 489-90). A treatment provider stated that Plaintiff needed to work on skills to prevent relapse and noted that Plaintiff would be in outpatient treatment (Tr. 493). The treatment provider diagnosed alcohol dependence, bipolar disorder, not otherwise specified, and borderline personality disorder (Tr. 492).

Later that month, Plaintiff presented to a treatment provider, whose signature is illegible, at Health Delivery and complained of lower back pain with radiation down the left leg (Tr. 505). The treatment provider prescribed medications (Tr. 505). Plaintiff returned to Health Delivery in March 2010 with complaints of lower back pain with radiculopathy (any nerve root disease) on the left and bilateral wrist numbness (Tr. 503). Plaintiff had numbness, greater on the right, a positive Phalen's sign, and pain on ranges of motion (Tr. 503). The treatment provider diagnosed bilateral carpal tunnel syndrome, lower back pain with radiculopathy, and bipolar disorder (Tr. 503).

Later in March 2010, Plaintiff presented to a treatment provider at Health Delivery, whose signature is illegible (Tr. 499). Plaintiff complained of left arm numbness and tingling, left leg pain, and lower back pain, worse on the left (Tr. 499). She also complained of problems walking and constant pain (Tr. 499). Plaintiff was anxious, talked rapidly, and was agitated (Tr. 499). The treatment provider diagnosed conditions including anxiety, leg pain, and carpal tunnel syndrome (CTS) by history (Tr. 499). She was prescribed medications (Tr. 499).

In April 2010, Plaintiff presented to Dr. Jose Jurado for an electromyography study (Tr. 513-15). Plaintiff reported chronic, diffuse pain all over that started in her hand, arm, neck, shoulder, lower back, and legs (Tr. 513). She also reported a weak grip, swelling, shaking, tremors, sweating, hot and cold changes, cramps, color change, balance problems, headaches, hearing difficulty, swallowing problems, some vision difficulties, and some dizzy spells (Tr. 513). On examination, Plaintiff had 1/4 reflexes in her biceps and triceps and in bilateral knee and ankle jerks (Tr. 514). She had functional ranges of motion in her neck, shoulder, elbow, wrists, and fingers, but reported pain (Tr. 514). A electromyography study revealed markedly severe bilateral carpal tunnel syndrome, with denervation and median neuropathy (nerve disease) (Tr. 514). It also revealed mild bilateral ulnar neuropathy, presenting as cubital tunnel syndrome, without denervation and

peripheral polyneuropathy (Tr. 514-15). Dr. Jurado opined that the neuronal changes were due to carpal tunnel, cubital, and neuropathy (Tr. 515). He stated that the neuronal changes were a neuromuscular junctional change causing peripheral spinal neural axial and autonomic changes, which would account for her neural pain (Tr. 515).

In May 2010, Plaintiff presented to a treatment provider at Health Delivery, whose signature is illegible, in follow-up to her electromyography study (Tr. 534). The treatment provider diagnosed bilateral CTS/bilateral cubital tunnel syndrome, lower back pain with radiculopathy, and major depressive disorder (MDD), rule out bipolar disorder (Tr. 534). Plaintiff was prescribed medications and referred for an MRI (Tr. 534).

Later that month, Plaintiff underwent a complete spine MRI (Tr. 519-21). The MRI revealed that Plaintiff had: mild to moderate cervical spondylosis (degenerative arthritis); congenital block vertebrae at C5-C6 with rudimentary disc narrowing; and a small syrinx (a pathological cavity) from C4 to T1 (Tr. 519-20). With respect to Plaintiff's thoracic spine, the MRI revealed: mild midlower thoracic spondylosis with multilevel mild to moderate chronic midlower thoracic vertebral body compressive deformities; and multilevel midlower thoracic focal small vertebral endplate depressions consistent with small intervertebral disc herniations (Tr. 520). In her lumber spine, Plaintiff had mild to moderate lumbar spondylosis producing borderline acquired spinal stenosis at L3-L4 (Tr. 521).

After the MRI, Plaintiff presented to a treatment provider at Health Delivery, for a follow-up appointment (Tr. 530). Plaintiff reported that she was sober and the treatment provider diagnosed conditions including lumbar spondylosis with acquired spinal stenosis at L3-L4, anxiety/major depressive disorder, and severe carpal tunnel syndrome (Tr. 530).

### 3. Vocational Expert

The ALJ asked the vocational expert (VE) a hypothetical question regarding jobs that could be performed by a person with Plaintiff's vocational profile who was capable of "light" work with additional limitations including: no constant or repetitive use of either upper extremity for grasping or fingering; no climbing ladders, ropes, or scaffolds; no unprotected heights or unguarded hazardous machinery; and only simple routine tasks, meaning minimal changes in the workplace setting and no more than occasional contact with the public (Tr. 54). The VE testified that such a person could work as a packer, inspector, and food preparer, with a total of 18,500 positions in Michigan (Tr. 54-55). The ALJ asked the VE to assume the same limitations, but added that due to bipolar disorder and posttraumatic stress disorder, the person could not sustain sufficient concentration, persistence, and pace to do even simple, routine tasks on a regular, continuing basis (Tr. 55). The VE testified that there were no jobs that could be performed by such a person (Tr. 56).

### C. Plaintiff's Claims of Error

Plaintiff raises three arguments on appeal: (1) that the ALJ did not properly account for the effects of Plaintiff's alcohol abuse in finding her not disabled; (2) that the ALJ failed to adequately address the testimony of Plaintiff's social worker, Ms. Schmitzer; and (3) that the ALJ failed to adequately consider of Plaintiff's carpal tunnel syndrome and spinal conditions.

## III. DISCUSSION

### A. Standard of Review

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial

determination that can be appealed first to the agency itself, then to an ALJ, and finally to the

Appeals Council.  *See Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is not found during this

administrative review process, the claimant may file an action in federal district court.  *Id.*; *Mullen*

*v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

   This Court has original jurisdiction to review the Commissioner's final administrative

decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the

court "must affirm the Commissioner's conclusions absent a determination that the Commissioner

has failed to apply the correct legal standard or has made findings of fact unsupported by substantial

evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005);

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  In deciding whether substantial

evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence,

or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v.*

*Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "It is of course for the ALJ, and not the reviewing

court, to evaluate the credibility of witnesses, including that of the claimant."  *Rogers v. Comm'r of*

*Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th

Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider

the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc.*

*Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are

to be given great weight, particularly since the ALJ is charged with observing the claimant's

demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting

credibility to a certain degree is appropriate where an ALJ finds contradictions among medical

reports, claimant's testimony, and other evidence.").  "However, the ALJ is not free to make

credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive.  42 U.S.C. § 405(g).  Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only.  *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation

-14-

marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B.      Governing Law

The "[c]laimant bears the burden of proving her entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.       Analysis and Conclusions

As noted earlier, Plaintiff raises three arguments on appeal.  Each of Plaintiff's arguments is considered below:

### 1.      The ALJ Appropriately Considered Plaintiff's Alcohol Abuse

Plaintiff's first argument is that the hypothetical question posed to the VE failed to account

for Plaintiff's substance abuse disorder (Pl.'s Br. at 4-5).  Although not entirely clear, Plaintiff

appears to assert that the ALJ erred in not including her diagnoses of bipolar disorder, alcohol

abuse, and PTSD in both hypothetical questions (Pl.'s Br. at 8).  Plaintiff also contends that the ALJ

improperly posed a hypothetical question to the VE, which resulted in testimony that Plaintiff could

not work, and then denied her disability claim based on evidence not in that hypothetical question

(Pl.'s Br. at 9).

Under the Act, a person cannot be considered disabled for disability benefits purposes if

drug addiction or alcoholism is a contributing factor material to a disability finding.  *See Trent v.*

*Astrue*, Case No. 1:09CV2680, 2011 WL 841538 (N.D. Ohio, March 8, 2011).  The Regulations

provide for the following procedure to determine if drug addiction or alcoholism is material to the

determination of disability:

> How we will determine whether your drug addiction or alcoholism is a contributing
> factor material to the determination of disability.
>
> a) General. If we find that you are disabled and have medical evidence of your drug
> addiction or alcoholism, we must determine whether your drug addiction or
> alcoholism is a contributing factor material to the determination of disability.
>
> (b) Process we will follow when we have medical evidence of your drug addiction or
> alcoholism.
>
> (1) The key factor we will examine in determining whether drug addiction or
> alcoholism is a contributing factor material to the determination of disability is
> whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and
> mental limitations, upon which we based our current disability determination, would
> remain if you stopped using drugs or alcohol and then determine whether any or all
> of your remaining limitations would be disabling.

-17-

(I) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. §§ 404.1535 and 416.935. In other words, if the ALJ completes the five-step process outlined above and determines that a claimant is disabled with substance abuse, the ALJ must then proceed to conduct a second five-step analysis in order to determine if the claimant would still be disabled without the substance abuse. *See Trent*, at *3. The claimant has the burden of proving that substance abuse is not a factor material to the determination of disability. *See Trent*, at *3, citing, *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999).

In this matter, the ALJ followed the dual-track process set out above. The first time through the five-step process, the ALJ concluded that – due to bipolar disorder and PTSD (exacerbated by substance abuse) – Plaintiff could not sustain sufficient concentration, persistence, or pace to perform even simple routine tasks on a regular and consistent basis (Tr. 20). The ALJ then found, based on the VE's testimony, that those limitations would preclude Plaintiff from performing her past relevant work or any other work existing in significant numbers in the national economy (Tr. 21-22). As required by the statue and regulations, the ALJ then went through the five-step process a second time, to determine whether Plaintiff would still be found disabled without her use of alcohol (Tr. 22-26).

The second time through the process, the ALJ found that – even if Plaintiff had not abused alcohol – she would continue to have severe impairments or combination of impairments (Tr. 22-23). Plaintiff avers that because the hypothetical question containing those limitations attributed

-18-

them to bipolar disorder and PTSD, that the ALJ was then obligated to find her disabled (Pl.'s Br. at

8). However, the ALJ concluded that Plaintiff would have a less restricted RFC if she quit abusing

alcohol (Tr. 23). The ALJ ultimately found that, absent alcohol abuse, Plaintiff could perform jobs

in significant numbers in the national economy, and was therefore not disabled (Tr. 25). Contrary to

Plaintiff's argument, the ALJ followed the mandated procedure for assessing substance abuse to the

letter, and Plaintiff has not identified any flaw in the ALJ's reasoning. Thus, Plaintiff's first

argument is not well-taken.

### 2. The ALJ Appropriately Considered The Testimony of Plaintiff's Social Worker, Ms. Schmitzer

Plaintiff's second argument is that the ALJ did not properly consider evidence from Ms.

Schmitzer, Plaintiff's counselor, in determining the effects of her alcohol abuse (Pl.'s Br. at 10-11).

However, a social worker is not an "acceptable medical source." *See* 20 C.F.R. §§ 404.1513(a), (d),

416.913(a), (d); *see also Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109, (6th Cir. 2010)

("[S]ocial workers are not acceptable medical sources under social security regulations."). There is

no "treating social worker rule," and the opinion of a social worker is not entitled to any particular

weight. *See Hayes v. Comm'r of Soc. Sec.*, No. 1:09–cv–1107, 2011 WL 2633945, at * 6 (W.D.

Mich. June 15, 2011) (collecting cases). Only "acceptable medical sources" can: (1) provide

evidence establishing the existence of a medically determinable impairment; (2) provide a medical

opinion; and (3) be considered a treating source whose medical opinion could be entitled to

controlling weight under the treating physician rule. *See* Titles II and XVI: Considering Opinions

and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims;

Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, SSR

06–3p (reprinted at 2006 WL 2329939, at * 1 (SSA Aug. 9, 2006)); *see also Bliss v. Comm'r of Soc.

Sec.*, 406 Fed. App'x 541 (2nd Cir. 2011) ("[T]he assessment by the social worker is ineligible to

receive controlling weight because social workers do not qualify as 'acceptable medical sources.'").
The opinions of a social worker fall within the category of information provided by "other sources."
*See* 20 C.F.R. §§ 404 .1513(d), 416.913(d).  The social security regulations require that information
from other sources be "considered."  2006 WL 2329939, at * 1, 4 (citing 20 C.F.R. §§ 404.1513,
416.913); *see Cole v. Astrue*, 631 F.3d 931, 939 (6th Cir. 2011); *Cruse v. Comm'r of Soc. Sec.*, 502
F.3d 532, 541 (6th Cir. 2007).  This is not a demanding standard.  It was easily met here.  Simply
put, the ALJ did not commit error in the treatment of Ms. Schmitzer's testimony.  In fact, Ms.
Schmitzer offered no testimony regarding Plaintiff's alcohol abuse.  Plaintiff contends that Ms.
Schmitzer's testimony that Plaintiff had not, to her knowledge, been tested for alcohol and drug use,
means that Ms. Schmitzer believed that Plaintiff had no problem with alcohol.  However, this
testimony does not lead to such a broad inference.  In any event, the ALJ considered Ms.
Schmitzer's testimony, and Plaintiff has not identified any flaw in the ALJ's reasoning.  Thus,
Plaintiff's second argument is not well-taken.

### 3.      The ALJ Appropriately Considered Plaintiff's Physical Impairments

Plaintiff's third, and final, argument is that the ALJ did not sufficiently account for her
carpal tunnel syndrome and spinal conditions in finding her not disabled (Pl.'s Br. at 12).  In support
of this argument, Plaintiff refers to the results of an electromyography study from April 2010 and a
spine MRI from May 2010 (Pl.'s Br. at 12, Tr. 519-21).  With respect to Plaintiff's carpal tunnel
syndrome, the ALJ considered Plaintiff's statements that she had significant hand and wrist
problems, recognized carpal tunnel syndrome as a "severe impairment" at step two, and included a
significant limitation in the RFC to accommodate that condition (Tr. 20, 44).  Indeed, in the ultimate
RFC, the ALJ found that Plaintiff could only do jobs that required "no constant repetitive use of

-20-

either upper extremity for grasping and fingering" (Tr. 23). This limitation adequately accounted for Plaintiff's carpal tunnel syndrome.

As to Plaintiff's spinal condition, while the ALJ did not discuss Plaintiff's complaints of back pain in detail, Plaintiff has failed to show that this condition caused her greater limitations than those included in the RFC. An MRI did show some spinal abnormalities (Tr. 538-539) – concluding that Plaintiff has "mild" to "moderate" spondylosis – however, Plaintiff does not point to any specific treatment for her back condition in the record, nor does Plaintiff cite to any doctor-imposed limitations in the record as a result of her alleged back impairment.

In sum, Plaintiff has failed to show that the ALJ committed reversible error in considering her physical conditions and the Commissioner's decision is supported by substantial evidence. *See Cutlip v. Sec'y of Health & Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes ... a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

## III.    RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for remand be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28

U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated: February 2, 2012

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was served on the parties of record on February 2, 2012, electronically and/or by ordinary mail.*

s/Barbara M. Radke
Judicial Assistant to Magistrate Judge Mark Randon